OF

# NORTH CAROLINA

AT

# RALEIGH

## SPRING SESSION, 1969

CITY OF RALEIGH v. NORFOLK SOUTHERN RAILWAY COMPANY

No. 68SC90

(Filed 26 February 1969)

**1. Declaratory Judgment Acts § 1— justiciable controversy**

A *bona fide* justiciable controversy which may be determined under the Declaratory Judgment Act, G.S. Chap. 1, Art. 26, is presented where, pursuant to a written agreement between the parties, a new railroad overpass was constructed by defendant railway company, plaintiff municipality has reimbursed the railway for its costs thereby incurred, and the parties have submitted to the court for determination the question of which of them must ultimately bear the expense.

**2. Constitutional Law § 11— exercise of police power — validity**

The validity of an exercise of the police power depends upon whether under all the existing circumstances it is reasonably calculated to accomplish a purpose falling within the legitimate scope of the power without burdening unduly the person or corporation affected.

**3. Constitutional Law § 11— exercise of police power — reasonableness**

The reasonableness of an exercise of the police power is to be determined by the court, and is based on human judgment, natural justice, and common sense in view of all the facts and circumstances.

**4. Constitutional Law § 11— police power — test of reasonableness — changed conditions**

While the standard of reasonableness by which exercise of the police power is tested does not change, changed conditions may bring the subject matter in question within the operation of approved testing principles of reasonableness or remove it therefrom.

**5. Constitutional Law § 11—   police power — test of reasonableness — changed conditions**

The effects of the exercise of the police power in particular situations may vary as social, economic and political conditions change, so that what was once a proper exercise of such power may later become arbitrary and unreasonable as a result of changed conditions and circumstances.

**6. Constitutional Law § 15;   Railroads § 2;   Municipal Corporations § 35—   rebuilding railroad bridge to accommodate widened city street — responsibility for cost**

An attempt by a municipality to impose upon defendant railway company the entire cost of rebuilding a railroad bridge to accommodate the increased width of a city street passing below the bridge *is held* an unreasonable exercise of the police power where the need to rebuild the bridge resulted entirely from the municipality's street widening project to facilitate a greatly increased flow of traffic, caused by factors unrelated to the existence or location of defendant's railroad tracks or the operation of trains thereon, economic conditions have changed favorably to the financial position of the municipality and unfavorably to that of defendant railroad, and reconstruction of the bridge will result in no benefit to defendant but solely to the benefit of its competitors.

**7. Municipal Corporations § 35;   Railroads § 2—   responsibility for cost of rebuilding railroad bridge — widened city street — evidence**

In a declaratory judgment action to determine whether plaintiff municipality may require defendant railroad to pay the entire cost of rebuilding its bridge to accommodate the increased width of the city street passing below the bridge, the trial court did not err in excluding expert testimony offered by the municipality which would have tended to show that the former width of the street was unsafe for the volume of traffic using it, such evidence tending to show the wisdom of widening the street but not that it would be reasonable for the municipality to require the railroad to pay the cost of a new bridge necessitated by the widening.

APPEAL by plaintiff from *Canaday, J.,* November 1967 Non-Jury Civil Session of WAKE Superior Court.

This is an action for a declaratory judgment to determine whether plaintiff municipality or defendant railway company should bear the costs of constructing a new bridge to replace the original bridge carrying defendant's tracks over Peace Street in the City of Raleigh. The parties waived jury trial and submitted the case to the trial court on stipulations of fact and evidence presented at the hearing. The court entered judgment making findings of fact substantially as follows:

On 18 January 1907 plaintiff City duly adopted an ordinance granting defendant railway's predecessor in interest the right, privilege and franchise to construct, maintain, and operate a railroad through said City and to that end to construct and maintain tracks

upon and across certain named streets, including Peace Street, within said City. The ordinance provided that the railroad should cross Peace Street upon a bridge having steel girders which would provide an opening 30 feet wide for roadway purposes and six feet on each side for sidewalk purposes (providing a total lateral clearance of 42 feet under the bridge for street roadway and sidewalks) and having a vertical clearance of 10½ feet from the street surface to the bottom of the girder. At the time the bridge was constructed the right of way of Peace Street was about 60 feet wide at the location of the bridge, and said right of way remains the same width at the present time. Defendant's predecessor built the railroad bridge across Peace Street in conformity with the provisions of the franchise and thereafter maintained its main line tracks over the bridge. Pursuant to the terms of the franchise the abutments of the bridge were constructed on the street right of way.

On 2 March 1959 the City Council of plaintiff City approved a "thoroughfare plan" for the City of Raleigh designating certain streets of the City, including Peace Street, to be widened for the accommodation of the increasing volume of vehicular traffic within the City. The proposed widening of Peace Street required the reconstruction of the railway bridge, and in 1962 the City and the defendant railway jointly prepared plans for a new bridge. It developed that the defendant railway could do the reconstruction according to the agreed plans for an estimated cost of approximately $47,000.00 and that it would cost considerably more for the work to be done by someone else. After the plans had been prepared and cost estimates made, the City attorney first learned that the abutments of the defendant's then existing bridge were in the Peace Street right of way. He then proposed that the City adopt an ordinance requiring the railway to remove the abutments from the street right of way under penalty of $100.00 per day for failure to commence and to complete such work within specified periods of time. The defendant railway appeared before the City Council in opposition to the proposed ordinance. After extended consideration, the parties entered into an agreement dated 8 January 1963 by which they agreed that the defendant railway would forthwith undertake the reconstruction of the bridge in conformity with the plans and specifications which had been agreed upon, that upon completion of the work the City would pay the railway the cost of such reconstruction, and that the determination as to which of the parties should ultimately bear such cost should be submitted to the court in a suit for declaratory judgment. Pursuant to this agreement the plaintiff City has brought this action for

declaratory judgment to determine whether it or the defendant railway must bear the cost of constructing the new bridge.

The agreement recited that the plans and specifications for the new bridge provide for piers for support of the reconstructed bridge on the north and south sides of Peace Street to be located so as to allow a lateral clearance of 51 feet, to set back 18 inches from the face of the curbs, and to be four feet in thickness. The agreement further recited that the City approved these plans on condition the railway provide from its own property and dedicate to public use area sufficient to provide for pedestrian walkways five feet wide on the north side of the north pier and on the south side of the south pier. The railway bridge over Peace Street has now been reconstructed in accordance with the plans and specifications prepared by the parties and approved by the City. In accordance therewith the new piers for the support of the reconstructed bridge have been placed within the street right of way of Peace Street, as is specifically provided for in the approved plans and specifications.

The trial judge made additional findings of fact, principally relating to changed conditions which had occurred in the years after the granting of the 1907 franchise to defendant's predecessor in interest. These findings include the following: In 1907 and for a number of years thereafter traffic on the public streets consisted mainly of horse-drawn vehicles, which were comparatively few in number, and only to a very negligible extent of automotive vehicles. At the time of the construction of the defendant's first bridge over Peace Street the lateral clearance of 42 feet between the abutments of the bridge was adequate to meet the public demand for the use of Peace Street at the location of the bridge. In 1910 the population of Raleigh was 19,218, whereas in 1960 the population was 93,931. The number of motor vehicles licensed by the City of Raleigh, in 1947 (the earliest date for which figures are available) was 8,763. In 1962 the number of such vehicles was 36,913. The official daily count of motor vehicles using Peace Street within the vicinity of defendant's bridge was 12,600 in 1950, decreased to 10,203 in 1954 (due in large measure to construction of Downtown Boulevard which tended to decrease the traffic on Peace Street in the vicinity of the bridge) and increased to 14,700 in 1961. Motor vehicles registered in North Carolina increased from 1,681 in 1909 to 2,056,888 in 1962. Automobile registration in Wake County increased from 15,292 in 1927 to 65,945 in 1961. Truck registration in Wake County increased from 2,190 in 1927 to 23,476 in 1961.

The defendant railway is no longer in the business of transporta-

tion of passengers, and over the years motor vehicles have handled a greatly increasing volume of the transportation of property which was formerly or would otherwise be handled by railroads. In 1907 no *ad valorem* taxes on motor vehicles were collected by the City of Raleigh, whereas in 1961 and 1962 the City collected substantial sums in such taxes. As its portion of gasoline taxes imposed by the State of North Carolina and allotted to it under the provisions of the Powell Act (Chapter 260, Session Laws of 1951; G.S. 136-41.2 *et seq.*) the City of Raleigh received the sums of $277,403.00 in 1960, $313,540.00 in 1961, and $362,069.00 in 1962. For the fiscal year ending 30 June 1963, the City had a surplus of over $213,000.00 of unspent funds received under the Powell Act. Changes in the economic conditions of the City and of the defendant from 1907 to 1962, as set forth in the foregoing findings of fact, are favorable to the financial condition of the plaintiff City and unfavorable to the financial condition of the defendant railway. Under the present highly competitive transportation conditions and systems, it is no longer possible for the defendant to include in its rates and charges the costs of rebuilding the bridge, as it might have done in former years under former conditions and circumstances.

There has never been a grade crossing at Peace Street, and Peace Street at the location of the defendant railway's overpass is not now on either the State or Federal systems of highways. The reconstruction of the defendant's bridge is a part of the City's program of extensive street improvements to handle a larger flow of motor vehicular traffic principally to and from other areas of the City. Peace Street is one of the principal and most convenient streets for the passage of automobile and truck traffic from downtown Raleigh to the northwestern section of the City, which is and has been for a number of years one of the most rapidly developing sections of the City. Neither the general location of the railroad tracks of the defendant nor their use for train operations is a reasonably related factor in producing heavy motor vehicular traffic on Peace Street in the vicinity of the bridge. Peace Street, prior to the recent reconstruction of the railway overpass, was adequate to handle all street and vehicular traffic originating in and around the immediate vicinity of the bridge. The only reason for the enlargement of the railway bridge over Peace Street is to provide an underpass for Peace Street wide enough to accommodate the greatly increased motor vehicle traffic to and from other parts of the City due to the growth of the City, and the same is not caused by any need for change on the part of the railway. The reconstructed bridge benefits only the motor vehicular travel-

ing public, including the chief competitors of the defendant, to wit, the owners and users of automobiles, trucks, and buses.

Pursuant to the foregoing findings of fact, the trial judge concluded as a matter of law: That to require the defendant to bear the expense of constructing the new bridge would amount to the taking of defendant's property without just compensation and without due process of law; that if the provisions of the Charter of the City of Raleigh involved in this action should be construed to require defendant to bear the expense of constructing the new bridge, then said provisions are arbitrary, unreasonable and unconstitutional and violate the Fourteenth Amendment to the United States Constitution and Article I, Section 17, of the North Carolina Constitution, in that they would deprive defendant of its property without due process and contrary to the law of the land; that the plaintiff has waived and is estopped from asserting any power to require defendant to remove any part of its bridge that lies within the right of way of Peace Street; that the imposition upon defendant of the entire cost of reconstructing the bridge is not fair or reasonable; that the present action constitutes an attempted condemnation and unlawful seizure by the plaintiff of the property rights and property of the defendant; that the plaintiff has no authority or right so to condemn the defendant's property rights in the manner here attempted; that the present action is not a condemnation action, and even if the City had any right to condemn the property rights of the defendant, it could not do so in this action; that this action is insufficient for any such purpose and is therefore improper; and that in so seeking to condemn the property rights and franchise of the defendant in this action, plaintiff is seeking to deprive defendant of its property without due process of law in violation of the provisions of the Federal and State Constitutions.

Pursuant to these findings of fact and conclusions of law, judgment was entered that the plaintiff bear the entire costs of constructing the new bridge over Peace Street and recover nothing of the defendant by this action. From this judgment, plaintiff appeals.

*Paul F. Smith, by Donald L. Smith, for plaintiff appellant.*

*R. N. Simms, Jr., for defendant appellee.*

*Joyner & Howison, by W. T. Joyner, Jr., for Southern Railway Company, amicus curiæ.*

*Maupin, Taylor & Ellis, by Thomas F. Ellis, for Seaboard Coast Line Railroad Company, amicus curiæ.*

PARKER, J.

**[1-3]** Decision of the questions presented by this appeal is controlled by the principles announced in *Winston-Salem v. R. R.*, 248 N.C. 637, 105 S.E. 2d 37. In that case the North Carolina Supreme Court held that a city ordinance of Winston-Salem requiring a railroad to bear the entire cost of reconstructing an overpass to accommodate the widening of the street below was unconstitutional as an unreasonable exercise of the police power, under the circumstances of that case. In that case the City had sought *mandamus* to enforce the challenged ordinance. In the present case, in very similar factual circumstances, the City seeks a declaratory judgment to ascertain its power to impose the entire costs upon the railroad. Pursuant to a written agreement between the parties the new overpass has been constructed by the defendant railway company, the City has reimbursed the railway its costs thereby incurred, and the parties have submitted to the Court for determination the question of which of them must ultimately bear the expense. A bona fide justiciable controversy being presented, the Declaratory Judgment Act, G.S., Chap. 1, Art. 26, offers an appropriate procedure for resolving the conflict. In deciding the extent of the plaintiff City's power in the case before us we are guided by the same standards and principles as was the Court in the *Winston-Salem* case, i.e., whether under all existing circumstances the City's exercise of the police power is reasonably calculated to accomplish a purpose falling within the legitimate scope of the power without burdening unduly the person or corporation affected. 16 Am. Jur. 2d, Constitutional Law, § 277, p. 537. Reasonableness in this context is a matter to be determined by the Court, *Durham v. R. R.*, 185 N.C. 240, 117 S.E. 17, and is said to be based on human judgment, natural justice, and common sense in view of all the facts and circumstances, *Bonnett v. Vallier*, 136 Wis. 193, 116 N.W. 885; 16 Am. Jur. 2d, Constitutional Law, § 278, p. 539.

**[4-6]** As noted in *Winston-Salem v. R. R.*, *supra*, the standard of reasonableness by which exercise of the police power is tested does not change, but changed conditions as they evolve may bring the subject matter in question within the operation of approved testing principles of reasonableness or remove it therefrom. The effects of exercise of the police power in particular situations may vary as social, economic and political conditions change; therefore, what was once a proper exercise of such power may later become arbitrary and unreasonable as a result of changed conditions and circumstances. In *Winston-Salem v. R. R.*, *supra*, the Court found that con-

ditions which in earlier years might have brought the attempted exercise of the police power by the City within the testing standard of reasonableness, and which had supported earlier Court decisions so holding, had so changed that exercise of the power had become no longer reasonable and therefore no longer compatible with constitutional requirements of due process. Under the special facts and all the surrounding circumstances of the present case, we reach the same conclusion and for essentially the same reasons emphasized by the Supreme Court in *Winston-Salem v. R. R., supra.*

In *Winston-Salem v. R. R., supra,* the Court pointed out that most of the earlier cases which had upheld imposition of financial burdens upon railroads in making crossing improvements had relied upon considerations of public safety and public convenience — the protection of the traveling public from the dangers of grade crossing accidents and the inconveniences caused by traffic interruptions at heavily traveled crossings — with greater emphasis being placed on the factor of public safety. In the present case as in *Winston-Salem v. R. R., supra,* "the element of public safety usually involved in railroad crossing cases is entirely missing; and the need for promoting the public convenience derives from the necessity for relieving traffic congestion, principally in other areas of the City, not caused in any manner by the location of the railroad tracks." There is not now, and never has been, any crossing at grade at the point where Peace Street intersects defendant's tracks.

[6] From the time defendant's tracks were first constructed into the City of Raleigh continuously until the present time, they have been carried over Peace Street on a bridge. The original bridge did not deteriorate or become in any manner in itself unsafe to the public passing under it. Rather, the need to rebuild the bridge resulted entirely from the City's street widening project, which in turn was made necessary to accommodate a greatly increased flow of vehicular traffic which was caused by factors totally unrelated to the existence or location of defendant's railroad tracks or the operation of trains thereon. Furthermore, the facts stipulated by the parties and the evidence submitted by the defendant fully support the trial court's finding of fact that economic conditions have evolved favorably to the financial position of the City and unfavorably to that of the defendant, and that the construction of the new bridge will result in no benefit to the defendant but solely to the benefit of its principal competitors. Under these circumstances, we agree with the trial court's conclusion that to require defendant to bear the cost of constructing the new bridge would be so arbitrary and unreasonable as

to fail to meet the test for a valid constitutional exercise of the City's police power.

[7]    At the trial plaintiff attempted to introduce evidence in the form of opinion testimony by expert witnesses which would have tended to show that the width of Peace Street, before it was widened, was unsafe for the volume of traffic using the street at that time. Plaintiff assigns as error the court's action in excluding this proffered testimony. This evidence, however, would not have tended to show that the bridge under existing conditions was itself a safety hazard, but would have shown only that the width of the street was unsafe, thereby justifying the City's decision to widen it. It is true that the excluded evidence would further have tended to show that if Peace Street had been widened and a new bridge had not been constructed, a traffic bottleneck would possibly have arisen at the bridge, thereby causing a safety hazard to arise. As in *Winston-Salem v. R. R., supra,* however, this situation would have resulted entirely from the City's attempt to relieve traffic congestion by widening Peace Street and would not have been caused by the existence or location of defendant's tracks. In referring to the same situation in *Winston-Salem v. R. R.,* the Court said, 248 N.C. 637, 650, 105 S.E. 2d 37, 46:

> "True, the City's evidence discloses that the present underpass is not wide enough to accommodate the full width of the proposed new street which is to intersect and cross the present street under the trestle at an oblique angle so as to make the proposed X crossing under the trestle. Therefore, unless the opening under the present trestle is widened, the new street will have to be reduced in width at the approaches to the present abutments. This would create on the new street a bottleneck at the approaches to the underpass and make for a hazardous situation for motorists approaching the underpass on the new street. But this situation of possible danger would be entirely of the City's making in its attempt to eliminate traffic congestion, originating principally in other areas of the City, by establishing a north-south intercity thoroughfare to accommodate traffic to be diverted and rerouted into it from outlying areas. Thus, in the case at hand the need for rebuilding the trestle is to promote the public convenience by providing a new street, and the need for opening the new street is to provide a necessary link in the proposed intercity thoroughfare, designed to relieve traffic congestion brought about by reason of the increase in motor vehicular traffic, and not by any conditions at or along

the railroad right of way tending to interrupt or impede the free movement of traffic at the crossing. Hence the need for the new trestle is not brought about by the location of the railway roadbed or by the operation of trains thereon."

[7]    In the present case the railroad is not contesting, and we are not concerned with, the right of the City to widen its streets. We are concerned here only with whether the City may require the railroad to pay the entire cost of rebuilding its bridge to accommodate the increased width of the City street passing below. The testimony which the City offered, and which the court excluded, tended to show the wisdom on the part of the City authorities in deciding to widen Peace Street; it did not tend to show that it would be reasonable for the City to require the defendant railway to pay the cost of a new bridge made necessary by such widening. There was no prejudicial error in excluding such evidence.

Appellant's brief seeks to distinguish the facts which existed in *Winston-Salem v. R. R., supra,* from the facts here, by pointing out that in that case the need for widening the trestle arose from the opening of a new street, whereas in the present case the need arises from the widening of an existing street. We do not consider this difference to be a controlling basis for distinguishing the two cases. In both cases the necessity for widening the roadbed under the railroad bridge arose from the need of a growing City to provide wider arteries for carrying greatly increased vehicular traffic from one part of the City to another. Whether the City chose to meet this need by widening an existing traffic artery or creating an entirely new one, is immaterial insofar as bearing upon the only question before us for decision, which is the reasonableness of imposing the resulting cost of widening the bridge upon the defendant railway company. For the reasons which were set forth in the decision of the Supreme Court in *Winston-Salem v. R. R., supra,* which we deem to be controlling in the present case, the decision of the trial court is

Affirmed.

MALLARD, C.J., and BROCK, J., concur.